171 P.2d 318

RICE v. FIRST NAT. BANK IN ALBU-QUERQUE (BAIR, Intervener).

No. 4901.

Supreme Court of New Mexico.

June 27, 1946.

Iden, Adams & Johnson, of Albuquerque, for appellant.

Rodey, Dickason & Sloan, and Frank M. Mims, all of Albuquerque, for defendant appellee.

Dailey & Rogers, and Jethro S. Vaught, Jr., both of Albuquerque, for intervener appellee.

HUDSPETH, Justice.

The plaintiff sued The First National Bank in Albuquerque for damages alleging negligence as escrow holder in failing to stop the recording of a deed, after the payment of a check of Kenneth H. Bair, the grantee in the deed, drawn on the escrow agent in favor of plaintiff had been stopped. Kenneth H. Bair intervened and defended on the ground that plaintiff was his agent, used his money in the purchase of the land, and was guilty of fraud. By stipulation it was agreed that plaintiff's rights under a written contract and the check given pursuant thereto as against the intervener should also be determined in this case. The findings and judgment were for the defendant bank and the intervener. Plaintiff has appealed.

Intervener proved to the satisfaction of the court that on the 15th of September, 1943, the plaintiff, a real estate broker, orally agreed to act as his agent in acquiring the Jerome Eddy Place in Valencia County, New Mexico, and stated that if he was authorized to go as high as $13,500 he would buy the place for intervener as cheaply as he could. He immendiately communicated with the owner and his broker by telephone and telegraph and on the following day the owner telegraphed that he would accept $9,500 net to him. On the 17th of September plaintiff received intervener's check for $6,500, and, using the check to secure the escrow deposit required by the owner, arranged to buy the place in his own name. On the same day he told the intervener that he had been able to get the place cheaper and had saved him $100; that he was get-

ting it for $13,400; that the owner would not deal with a third party and that he would have to take title in his own name. On the following day by these and other false representations he induced the intervener to enter into a written contract with him for the purchase of the place for the sum of $13,400, conditioned upon plaintiff acquiring title from the owner.

The first point argued by plaintiff is: "The written contract between appellant and intervener, dated September 18, 1943, was at all times valid and binding, there being no substantial evidence of an agency contract between them or of any fraud on appellant's part."

Some of the states have statutes regulating real estate brokers and requiring contracts of employment to be in writing; and many of the reported cases where an agent has taken title in his own name turn on an interpretation of the statute of frauds—not involved here—upon which there is hopeless conflict. However, it is universally held that where the principal furnishes the purchase money at or before the time of the purchase by the agent that a trust results in favor of the principal. It is of little moment whether an agreement of agency is made with fraudulent intent, or the agent succumbs to covetousness after he enters upon his duties, upon learning of the large profit which may be made by abandoning his trust. Nebraska Power Company v. Koenig, 93 Neb. 68, 139 N.W. 839, 842.

The general rule is that he who undertakes to act for another in any matter of trust or confidence shall not in the same matter act for himself against the interest of the one relying upon his integrity. Canfield v. With, 35 N.M. 420, 299 P. 351; Craig et al. v. Parsons et al., 22 N.M. 293, 161 P. 1117; Duncan v. Holder et al., 15 N.M. 323, 107 P. 685; Foster et al. v. Zapf et al., 35 N.M. 319, 296 P. 800; McBride v. Campredon, 24 N.M. 323, 171 P. 140, L.R.A. 1918D, 407; A.L.I. Restatement of Agency, Vol. 2, Sec. 387.

However, plaintiff strenuously argues that there is no substantial evidence of agency and points to the admitted fact that there was no agreement as to plaintiff's compensation; that the words "broker" or "agent" were not used by either plaintiff or intervener and that intervener requested and was given a warranty deed, although it was not provided for in the written contract of September 18, 1943.

Plaintiff also points out that he had to pay commissions, taxes and the interest on a $3500 mortgage, which he gave as a part of the purchase price of the tract, and dilates upon the inconsistencies of the testimony of the intervener, citing 24 Am. Jur. 188, et seq.

Other reviewing courts have considered similar cases. The Supreme Court of Cal-

ifornia in the case of Stromerson et al. v. Averill, 22 Cal.2d 808, 141 P.2d 732, 736, said:

"Inconsistencies only affect the credibility of the witness or reduce the weight of his testimony and it was for the trier of the fact to weigh the evidence and determine his credibility. 10 Cal.Jur. p. 1146, § 364. Furthermore, it is the duty of the court in support of a judgment on appeal to harmonize apparent inconsistencies wherever possible. 2 Cal.Jur. p. 938, § 551. It might also be noted that the testimony of Averill was supported by many circumstances and corroborated in important particulars by Davis, Lincoln and others. In our opinion there was substantial evidence to sustain the finding that Stromerson was acting as Averill's agent in the purchase of the 562 acres of land.

"It is contended, however, that since the judgment is based upon constructive fraud the facts which are relied upon to establish the fraud must be proved by clear, satisfactory and convincing evidence. The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal. Steiner v. Amsel, 18 Cal.2d 48, 53, 54, 112 P.2d 635; Steinberger v. Young, 175 Cal. 81, 84, 85, 165 P. 432; Couts v. Winston, 153 Cal. 686, 688, 689, 96 P. 357."

In an earlier decision of this case reported in 133 P.2d 617, on page 622:

"There can be no doubt that a fiduciary relationship exists between an agent and his principal. Civ.Code, §§ 2322, 2228–2239; 1 Cal.Jur. 788. It should be equally clear that where an agent is employed to purchase real property and purchases it in his own name and denies the trust, he holds it as a constructive trustee, even though the principal advanced none of the purchase price. That principle follows from the rule that the breach on the part of the agent of his fiduciary duty constitutes constructive fraud. Such a trust is not banned by the statute of frauds. Civ.Code, § 2224; Restatement, Agency, § 414; Restatement, Restitution, § 194; Williston on Contracts, Rev.Ed., vol. 4, § 1024; and cases collected [Kimmons v. Barnes & Metcalfe, 205 Ky. 502, 266 S.W. 891], 42 A.L.R. 10; [Quinn v. Phipps, 93 Fla. 805, 113 So. 419], 54 A.L.R. 1195; [Carkonen v. Alberts, 196 Wash. 575, 83 P.2d 899], 135 A.L.R. 232. * * * The breach of the fiduciary relation is even more pronounced because by having the agent take the property in his own name shows a greater degree of trust and confidence existing between the principal and the agent. The only difference is that the breach of the fiduciary relation comes with the repudiation by the agent of his duty

to hold the property for his principal when he repudiates his trust, rather than a breach in the inception when he acquires property in his name for himself when he should have acquired it for the principal and in the latter's name."

The Supreme Court of Florida in the case of Quinn et al. v. Phipps, 93 Fla. 805, 113 So. 419, 421, 54 A.L.R. 1173, discusses the evidence in a case somewhat similar to the one under consideration; from which we quote:

"Now let us inspect the record and see what it reveals to establish a relation of trust and confidence between Quinn and Phipps. It is shown that Quinn was a real estate broker doing business in West Palm Beach; that McDonald was the agent of Phipps; that Quinn on his own initiative approached McDonald and told him that he had a price on Mrs. Watson's property and requested him (McDonald) to assist him in finding a purchaser for it; that McDonald immediately communicated this information to Phipps, who authorized him (McDonald) to submit to Mrs. Watson through Quinn a cash offer of $50,000 for the property. It is further shown that McDonald urged Quinn to submit the offer to Mrs. Watson by long-distance telephone, but Quinn refused, agreeing instead to go to Boston in person to negotiate the purchase for Phipps. Quinn proceeded at once to Boston in compliance with his agreement with McDonald, but, after interviewing Mrs. Watson, instead of purchasing for Phipps, he purchased the property for himself at $45,000, and made no mention of Phipps' offer. The testimony of McDonald is positive as to all these facts, and his testimony is strongly corroborated by that of David T. Layman, John S. Phipps, George M. Osborne, and Mrs. Watson. The record also contains many revelations and recitations strongly supporting McDonald's testimony. It is true that Quinn denies every material allegation affirmed by McDonald, but his testimony is uncorroborated, and his conduct touching his relations to Phipps, Mrs. Watson, and his codefendant Gregory, not only rebuts his testimony, but it was entirely out of harmony with any code of business or professional ethics known to this court. The Chancellor believed McDonald's version of the facts, and his finding is amply supported by the record.

"Appellants urge that McDonald's testimony is materially weakened by his response to the following question propounded on direct examination: 'Was he to make that proposition for Mr. Phipps?' His response was, 'I certainly thought so; if I had not, I would not have fooled with it.' It is contended by appellants that, McDonald's response not being a direct affirmative, it had the effect of materially weakening or discrediting the force of his entire testimony. We do not consider this contention well grounded."

■ The Court of Errors and Appeals of New Jersey in Rogers v. Genung et al., 76 N.J.Eq. 306, 74 A. 473, 475, quoted with approval from Wright v. Smith, 23 N.J. Eq. 106, the following:

"* * * In holding the defendant to an accounting, the vice chancellor said that the fact that Smith was not formally constituted an agent with authority to bind the complainant, or that his agreement to act for him was not formally made, 'are points, which, if true, are of no sort of importance, nor is it important that no agreement was made to compensate him for his services. It is sufficient that he accepted and held a situation of trust in reference to procuring the lands.' "

The Supreme Court of Wisconsin in the case of Krzysko et al. v. Gaudynski et al., 207 Wis. 608, 242 N.W. 186, 189, said:

"One may become an agent without compensation. Absence of compensation is immaterial. Wright v. Smith, 23 N.J.Eq. 106, 111. If a real estate agent actually agrees orally to purchase land for another and takes money from the other to make the first payment on the purchase price, he must be held to have assumed to act for the other. And, having assumed so to act, he should be held to the same obligations of duty as if he were acting under a contract binding the other party to pay him a compensation. Counsel for respondent concede that, apart from the question of the invalidity of the contract of agency, the authorities are to the effect that the agent is bound as trustee; (A) one line of cases so holding him when the principal furnished the money for the purchase, and the (B) other line so holding him regardless of this; some (a) upon the ground that the agreement is not a contract to convey realty because it was not contemplated the agent should take the title in himself, and (b) others on the ground of the fiduciary relationship between the principal and agent." (Citing cases)

■ The weight to be given a request for a warranty deed by the principal of an agent was considered in the case of Kroll et al. v. Coach, 45 Or. 459, 78 P. 397, 399, from which we quote:

"In the legal aspect of the case, the defendant assumed a relation of trust and confidence toward plaintiffs. His position was such that he had exclusive knowledge of subsisting conditions affecting the venture that he proposed, and the plaintiffs were dependent entirely upon his representations, and relied upon them. In effect, he acted as their agent, as well as for himself, in negotiating and consummating the purchase from the original holders of the land to which they subsequently acquired the title in their own right. Such a relation enjoined upon the defendant absolute good faith toward the plaintiffs, and he was duty bound, in law as well as in ethics, to dis-

close to his principals all the knowledge attending the transaction that he possessed. If he had been dealing with them at arm's length, as his theory of the case would imply—that is, if he had been selling to them, instead of buying for them—the duty would have been otherwise. But he was not. He occupied the position of negotiating a joint purchase for the three, including the plaintiffs and himself, and plaintiffs were entitled to all the advantages jointly with him that he contracted for under his option with the original holders. According to his representations, they were securing all such advantages in the exact proportion that he was securing them, and, acting upon such representations, the purchase was consummated. It developed later, however, that he knowingly misled them as to a material fact in the transaction—one that would have influenced them to act differently, in all probability, if they had known of the true condition. The act was in palpable fraud of the plaintiffs' rights, and, as defendant thus secured an advantage he could not otherwise have obtained, he has through deception possessed himself of the plaintiffs' money to the extent of $2 per acre for three-fourths of the tract, which he applied toward the purchase of his own undivided one-fourth interest, and in this he must be held to the accountability of a trustee ex maleficio. The authorities are ample in support of this view. Wright v. Smith, 23 N.J.Eq. 106; McNutt v. Dix, 83 Mich. 328, 47 N.W. 212, 10 L.R.A. 660; King v. Wise, 43 Cal. 628; Willink v. Vanderveer, 1 Barb. [N.Y.] 599. Agency is a fiduciary relation, which is one of trust and confidence, and 'the same observations apply,' says Mr. Perry in his work on Trusts (vol. 1 (4th Ed.) § 206), 'as to other relations of trust and confidence.' He further observes: 'No person whose duty to another is inconsistent with taking an absolute title to himself will be permitted to purchase for himself, for no one can hold a benefit acquired by fraud or a breach of his duty. All the knowledge of the agent belongs to the principal for whom he acts, and, if the agent use it for his own benefit, he will become a trustee for his principal.' "

And on motion for rehearing, 45 Or. 459, 80 P. 900, 901—

"The deed is no more effective to conclude plaintiffs from inquiry touching the fraud than would the original contract have been, had it been wholly reduced to writing. But the defendant having deceived the plaintiffs, and procured from them their money through fraud, while acting in the capacity of an agent for them, the law declares him a trustee ex maleficio, in spite of the contract which he induced them to enter into by misleading them as to the real terms of the purchase from the original owners."

See also Evanoff v. Hall, 310 Mich. 487, 17 N.W.2d 724; and Stephenson v. Golden et al., 279 Mich. 493, 272 N.W. 881.

The testimony of plaintiff is in sharp conflict with that of the intervener, although he admitted that the $13.40 was a charge against the intervener in their final settlement, which the court found plaintiff had exacted of intervener as a 2 per cent Emergency School Tax on 5 per cent commission on the price of $13,400. Intervener is corroborated to some extent by other witnesses. Tom Hughes, the owner's broker, testified that plaintiff said nothing about buying the place himself in the telephone conversation on the night of the fifteenth, but it appears that after receipt of the owner's telegram of the sixteenth offering to sell for $9,500, plaintiff wired Hughes on the seventeenth, "I am buying it personally with view of trading as I told you by phone night of Sept. 15th."

On the 22nd of October the plaintiff and intervener met at the desk of Woodward, the Vice President of the defendant, for the purpose of closing the deal, and agreed on the amount of $3,367 as the balance due plaintiff from intervener on the price of $13,400, intervener assuming the mortgage for $3,500, given by plaintiff. Intervener drew his check for that sum on defendant, in favor of plaintiff, and handed the check to the Vice President of the defendant. The instructions given the escrow agent were reduced to writing and after being approved by the plaintiff and intervener were initialed by the Vice President of the defendant as follows:

"October 22, 1943

"Major K. H. Bair has handed to me his check for $3,367.00, payable to the order of C. T. Rice, which check is to be delivered to Mr. Rice after a Warranty Deed, executed by Edna L. Rice and C. T. Rice in favor of Kenneth H. Bair et ux., has been recorded in Valencia County, and abstract of title covering the property has been continued and does not show any intervening instrument from the time the property was conveyed to C. T. Rice until the time that C. T. Rice conveys the property to Major Bair.

"Immediately upon the return of the abstract to us, and if no intervening instruments have been filed of record, the check for $3,367.00 is to be delivered to Mr. Rice."

After the delivery of the papers to the Vice President of the defendant, intervener, who had been told that morning that the stamps on the deed from Eddy to plaintiff indicated that the consideration was only $9,500, called plaintiff into a private office in the bank where a conversation took place during which the plaintiff admitted he paid only $9,500 for the property. A heated argument ensued about

which the intervener testified, in part, as follows:

"He said something about the commissions he had to pay, and using his credit to negotiate the deal. I said: 'You didn't use any credit at all; you used my $6,500.-00 check, plus the $3,500.00 mortgage on the property concerned.' He said: 'I did use my credit; I used my credit to borrow money from the bank.' So then I stepped to the door and called Mr. Woodward into the room, and I said to Mr. Woodward: 'Mr. Rice says he used his credit to negotiate this deal. Is that true?' And Mr. Woodward turned to Mr. Rice and said: 'Do you want me to answer that question?' And Mr. Rice said 'Yes.' Then Mr. Woodward said: 'You didn't use your credit; you were using Major Bair's $6,500.00 check, plus the $3,500.00 mortgage on the property concerned.' He then said to Rice: 'I don't like the tone of this deal; I don't like what you have done here, and I would prefer that you take your account out of this bank.' Mr. Rice said: 'All right; if that is what you want', and he walked out, and I did."

■ The intervener consulted a lawyer and at 10:00 o'clock the next morning, on the advice of his counsel, stopped payment on this check. On the afternoon of October 22nd the deed was forwarded by the bank by registered mail, special delivery, to the County Clerk of Valencia County, some twenty-odd miles away, for record. The failure of the bank to endeavor to stop the recordation of the deed and to promptly notify plaintiff of the stop-payment order are the acts of alleged negligence on which plaintiff's action for damages is based. We are constrained to hold that the evidence that plaintiff agreed to act as the agent of intervener in the purchase of the land is substantial and it follows that a fiduciary relation existed between plaintiff and intervener; that plaintiff violated his duty to his principal and perpetrated a fraud upon the intervener.

■ Oral testimony was admissible to prove the fraud. This case falls in the exception to the oral evidence rule stated in Alford v. Rowell, 44 N.M. 392, 103 P.2d 119.

■ Plaintiff maintains that intervener waived the fraud. 37 C.J.S. § 69 of title "Fraud," p. 362, after stating that one may waive his right to maintain an action or counterclaim for damages sustained by the fraud of another, says:

"It is, however, difficult and perhaps hazardous to formulate or to apply general rules as to what will constitute such a waiver, and each case in which the question arises must be considered and disposed of on its own special facts, the underlying question being one of intent."

■ In this case the court found and concluded that there existed the relationship of agency between plaintiff and intervener.

that the plaintiff took only the bare legal title to the land, and held it subject to a resulting trust in the intervener, that after intervener paid plaintiff $6,500 and assumed the mortgage for $3,500, it was plaintiff's duty to convey the land to intervener; that plaintiff had suffered no damage, and that intervener had no duty to rescind.

Intervener only had definite knowledge of the fraud about noon October 22nd when plaintiff admitted that he paid Eddy only $9,500. At 10:00 o'clock the next morning he stopped payment on the check. He discovered the fraud in time to save himself and did so.

Rescission would have been inadequate, and he was not limited to that remedy. Harris v. Egger, 6 Cir., 226 F. 389, 141 C.C.A. 219; Great Western Gold Co. v. Chambers, 153 Cal. 307, 95 P. 151; McCornick & Co., Bankers, v. National Copper Bank of Salt Lake City et al., 49 Utah 296, 163 P. 1097; 24 Am.Jur. p. 46.

We have carefully read and considered the record and hold that the findings of the trial court are supported by substantial evidence, and that the claimed errors are without merit.

The judgment will be affirmed and the cause remanded. It is so ordered.

SADLER, C. J., and LUJAN, J., concur.

BICKLEY and BRICE, JJ., did not participate.